## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TASCO ELECTRIC, INC.,
United States of America, for the
use and benefit of a Utah Corporation,

   Plaintiff,

  vs.          Civil No. 97-666 BB/LCS-ACE

FIDELITY AND DEPOSIT COMPANY
OF MARYLAND and LUTHER CONSTRUCTION
COMPANY, INC.,

   Defendants/Counter-Claimant.

## TASCO'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### TASCO'S PROPOSED FINDINGS OF FACT

1.  The Project was designed by Arctic Slope. Arctic Slope was not involved in the construction administration of the Project.

2.  The Bureau of Indian Affairs ("BIA") hired Holleyman and Associates to handle the construction administration for the Project.

3.  Bids for the Project were submitted in December, 1993.

4.  In January, 1994, Luther Construction Company ("Luther") was awarded a contract by the BIA for the construction of the Project. The contract sum was $4,897,000.

5.  Luther's contract with the BIA had a duration of 540 days. Luther was given a Notice to Proceed effective March 21, 1994.

6.  Luther provided to the BIA Payment Bond No. 6565303, issued by Fidelity & Deposit Company of Maryland ("F&D) .

7.  Tasco Electric, Inc. ("Tasco") submitted a bid to Luther for the performance of electrical work on the Project.

8.  Tasco's bid was not the lowest bid for the electrical work received by Luther.

9.  Luther initially submitted a subcontract to Howard Electric in March of 1994 at the same time that Luther was submitting subcontracts to other subcontractors.

10. Luther scheduled the work to begin in March of 1994 and to be completed in early September, 1995.

11. Luther provided that schedule to the BIA and to Luther's subcontractors.

12. Work started on site as scheduled in March, 1994.

13. The underground mechanical work started in April, 1994, as initially planned by Luther.

14. The underground electrical work did not start in April of 1994 as initially planned by Luther because Howard Electric refused to perform the electrical work.

15. Luther contacted Tasco in about June, 1994 to inquire if Tasco would perform the electrical work.

16. Tasco agreed to perform the electrical work on the Project.

17. Tasco was sent a subcontract by Luther dated June 21, 1994, in the sum of $766,783.

18. Tasco subcontracted the special systems on the Project to Skyline Fire and Communications for approximately $221,459.

19. Luther scheduled the work of Tasco to be completed in August of 1995.  Luther provided a written schedule to Tasco reflecting that time frame.

20. Tasco visited the Project site prior to starting work on the site. Tasco began performing work on site on July 11, 1994, after other work had begun on site and

after the electrical work should have begun on site but for the change in electrical subcontractor from Howard Electric to Tasco Electric.

21.   Tasco worked to "catch-up" with the other activities that had already begun on site.

22.   Luther agreed to support the activities of Tasco in catching up with the other activities at the site.

23.   Tasco did not delay the work in its initial weeks on site as it was working to catch up with the other activities on site.

24.   As Luther began work on site, Luther discovered errors in the plans provided by the BIA.

25.   The BIA was displeased with the plans for the Project.

26.   There were errors in the plans that caused the work on site to be delayed.  These government-caused delays were on the critical path and extended the completion date of the Project.

27.   The catch-up work of Tasco was not a delay to the critical path in the early months of the Project.  The critical path went through the government-caused delays to the Project.

28.   The plans for the Project were incomplete and defective in many particulars.

29.   Luther, for itself and on behalf of its subcontractors, submitted many Requests for Information to the BIA and its designers in an attempt to get clarifications and answers to questions about the plans and the Project.  Approval time for the review of submittals and responding to RFIs was not to be in excess of 14 days.

30.   The BIA and its agents were slow in providing responses to Requests for Information to Luther.

31.   Luther was in turn slow in providing responses to Requests for Information to Tasco.

32.   Luther repeatedly complained to the BIA and its agents that the BIA's failure to
      timely respond to RFIs and otherwise provide information was delaying the
      completion of the Project.

33.   The delays on the part of the BIA in responding to RFIs and otherwise providing
      information to Luther in fact delayed the completion of the Project.

34.   The experts concur that the critical path for the Project went through BIA caused
      delays and not through activities of Tasco.

35.   The Project was not substantially completed until on or about April 12, 1996,
      some seven months after Luther had scheduled to complete the Project.  Final
      completion did not occur until August 27, 1996.

36.   Luther spent approximately seven months longer on the site due to the BIA-
      caused delays to the Project.

37.   Luther experienced an increase in its general conditions costs due to the fact that
      its general conditions were extended some seven months longer than scheduled.

38.   Luther experienced an increase in its home office overhead costs allocable to the
      Project due to the fact that Luther was supporting the work some seven months
      longer than scheduled.

39.   Tasco experienced an increase in its general conditions costs due to the fact that
      Tasco's general conditions were extended some four months longer than
      scheduled.

40.   Tasco experienced an increase in its home office overhead costs allocable to the
      Project due to the fact that Tasco was supporting the work some six months
      longer than scheduled.

41.   Due to the numerous changes and delays to the Project, Luther made many
      requests for time extensions to the BIA including the following:

| 5/13/94 | Lowering of building footings | 21 days |
|---|---|---|
| 8/25/94 | Waterline relocation | 60 days |
| 9/24/94 | Changes in metal frames | 45 days |
| 11/30/94 | Adding security window frames | 15 days |
| 12/14/94 | Moving water lines | 30 days |
| 4/7/95 | Changes in landscaping | 30 days |
| 4/24/95 | Survey sewer easement | 5 days |
| 8/16/95 | Changes in gate to courtyard | 10 days |
| 8/19/95 | Changes in the soffit | 15 days |
| 8/19/95 | Changes in paint on exterior block | 15 days |
| 8/19/95 | Changes in control joint in block walls | 10 days |
| 8/30/95 | Security door & hardware and ceilings | 30 days |
| 9/19/95 | Adding spillways | 15 days |
| 10/19/95 | Changing roof top air conditioning units | 15 days |
| 10/19/95 | Changes in smoke dampers | 10 days |

**Total          326 days**

42.   The BIA granted only one time extension requested by Luther for 33 days in
      Change Order No. 1, dated Sept. 13, 1994 between the BIA and Luther.  The
      adjusted completion date for the contract then became Oct. 4, 1995.

43.   As to Luther's remaining requests for time extension, the BIA neither accepted
      nor rejected them but rather took them under advisement until after the
      completion of the Project.

44.   Luther management never communicated to the subcontractors, including Tasco,
      that the BIA had granted a 33-day time extension.

45.   Luther management never communicated to its superintendent that the BIA had
      granted a 33-day time extension.

46.   Luther management never communicated to its superintendent that it was
      requesting numerous time extensions to the contract because of the BIA-caused
      delays.

47.  The Luther superintendent, since he was never informed of the time extensions and pending time extensions, never was able to schedule the work to a new completion date.

48.  The Luther superintendent continued to push the subcontractors, including Tasco, for completion without taking into account the impacts of the BIA-caused delays.

49.  The Luther superintendent only provided one update to the initial schedule, an update done in early July, 1995.  The updated scheduled continued to show the completion of the Project in early September, 1995.

50.  The Luther superintendent did not hold regular meetings with the subcontractors to coordinate the work of the subcontractors.

51.  The Luther superintendent did not provide minutes of the meetings that were held nor did he provide any action items discussed in any of the meetings nor was there any list of follow-up items tracked by the Luther superintendent.

52.  The BIA did not assess any liquidated damages against Luther for the fact that substantial completion occurred many months after the adjusted contract completion date of October, 1995.  Rather, the effect was that Luther was granted time extensions to cover the approximate seven-month over run to the initial contract time.

53.  Luther and Tasco agreed, on July 24, 1997, to cooperate with each other in pursuing a claim or claims against the BIA for damages each had experienced as a result of the BIA's conduct.  Luther further agreed to have its expert work with Tasco and Tasco's expert in pursuing the claim or claims against the BIA.  Luther and Tasco agreed to stay the present litigation pending their joint pursuit of a claim against the BIA.

54. Unbeknownst to Tasco, Luther had already submitted a claim to the BIA earlier in July of 1997.

55. Luther breached its agreement with Tasco and pursued its claim against the BIA without involving Tasco in anyway. Luther never informed Tasco that it was having discussions with the BIA, never invited Tasco to participate in any negotiations with the BIA and settled their claim with the BIA without input or involvement by Tasco. Rather, Luther informed the BIA that it did not have any claim from Tasco, that it was involved in litigation with Tasco and that it did not expect to lose its litigation with Tasco.

56. Despite repeated requested requests from Tasco, Luther refused to provide a copy of its claim to the BIA until after Luther had settled its claim with the BIA and after Tasco had to resort to subpoenaing the report from Luther's expert in late 1998.

57. Tasco is entitled to additional compensation from Luther for increased general conditions in the sum of $_____.

58. Tasco is entitled to additional home office overhead from Luther for supporting the Project during the extended period of time in the sum of $_____.

59. Tasco is entitled to additional compensation for an overrun of manhours from Luther and F&D in the sum of $_____.

60. Tasco's bid was reasonable. Tasco was not the low bidder for the electrical work. The amount bid by Tasco for materials was within reasonable expectation of the amount actually spent by Tasco. Tasco's labor estimate was reasonable.

61. The masonry work was scheduled by Luther to start in June, 1994 and complete in December, 1994. The masonry work began as scheduled in June, 1994. The masonry work was extended approximately four months longer than the masonry was scheduled by Luther to take.

62.   The manhours expended by Tasco in supporting the masons used up a significant portion of the bid manhours.

63.   Tasco did not pay Skyline some money on the Project to which Skyline was entitled. Skyline sued Tasco, Luther and F&D. Luther paid Skyline $42,000 to settle the lawsuit and deducted that amount from the balance owed to Tasco.

64.   Tasco, considering the circumstances of the job, reasonably managed, supervised and staffed the Project.

65.   Tasco's foreman did not spend five hours a day in the trailer reading the newspaper and drinking coffee as alleged by Luther.

66.   Luther did not properly manage, coordinate and schedule the work on the Project.

67.   Material deliveries did not adversely impact Tasco's work on the Project.

68.   The Change Orders between Tasco and Luther only compensated Tasco for the direct costs of those changes. No compensation was paid by Luther for any impact or disruption costs. The Change Orders contain no language waiving any claim by Tasco for any impact or disruption costs.

69.   Luther was on notice of the claims of Tasco no later than March, 1996. Luther chose not to pursue those claims with the BIA. The BIA did not reject the claims as untimely.

## TASCO'S PROPOSED CONCLUSIONS OF LAW

70.    The BIA impliedly warranted to Luther that the plans and specifications are
       suitable for the Project and not defective.

71.    Luther impliedly warranted to its subcontractors, including Tasco, that the plans
       and specifications are suitable for the Project and not defective.

72.    That between Tasco and Luther, Luther is responsible to Tasco for the BIA's
       defective plans and specifications.

73.    That between Tasco and Luther, Luther is responsible to Tasco for the BIA-
       caused delays to the Project.

74.    Luther breached its subcontract with Tasco, in at least the following ways: (1) by
       providing defective plans and specifications; (2) by being responsible for delays
       to the Project that resulted in the completion to be delayed, and (3) by failing to
       properly schedule, coordinate and manage the work of the subcontractors
       including Tasco.

75.    Tasco is entitled to pursue a Modified Total Cost Claim on the labor component
       of its bid because of the impracticality of tracking impacts to the labor hours by
       the fact that the project duration was significantly extended for Tasco's work.
       Tasco is entitled to additional costs of labor in the sum of $_____.

76.    The Change Orders between Luther and Tasco do not contain any language
       waiving any claims.  They do not act as an accord and satisfaction of any impact
       or disruption costs.

77.    Tasco did not, by negotiating progress payment checks from Luther, release
       Luther from Luther's obligations for additional payments for labor and materials
       being supplied on the project.

78.     Luther cannot assert a backcharge for any alleged actual damages because its subcontract with Tasco includes a liquidated damage clause providing for delay damages at $300/day.

79.     Luther breached its obligations under the Settlement Agreement dated July 24, 1997 and, therefore, cannot enforce the terms thereof.

80.     The payment bond is for the benefit of unpaid subcontractors including Plaintiff.

81.     Under the Miller Act, Tasco is entitled to recover its damages against F&D.

82.     Tasco is the prevailing party in this litigation and is entitled to recover its reasonable attorneys fees and costs against Luther and F&D.

83.     Tasco is entitled to pre-judgment interest against Luther and F&D.

        DATED this _25th_ day of July, 2000.

                          BABCOCK BOSTWICK SCOTT CRAWLEY & PRICE

                          Robert F. Babcock
                          57 West South Temple, Suite 800
                          Salt Lake City, Utah  84101
                          Telephone: (801) 531-7000
                          Facsimile: (801) 531-7060


                          CALVERT – MENICUCCI


                          Sean Calvert
                          1303 Rio Grande Boulevard, NW, Suite 7
                          Albuquerque, New Mexico 87104
                          Telephone: (505) 247-9100
                          Facsimile: (505) 247-9761

                          Attorneys for Plaintiff
                          Tasco Electric, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of July, 2000, I caused a true and correct copy of the foregoing **TASCO'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** to be served upon the following by placing copies thereof in the United States mail, first-class postage pre-paid, addressed as follows:

David W. Bunting
RODEY DICKASON SLOAN AKIN & ROBB, P.A.
Albuquerque Plaza
201 Third Street NW, Suite 2200
Albuquerque, New Mexico   87102