**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**



FILED
UNITED STATES DISTRICT COURT
MEXICO

JUL 2 4 2000

CLERK

UNITED STATES OF AMERICA FOR
THE USE AND BENEFIT OF TASCO
ELECTRIC, INC., a Utah Corporation,

      Plaintiff,

vs.

                                              CIV 97-0666BB/LCS

FIDELITY AND DEPOSIT COMPANY
OF MARYLAND, and LUTHER CONSTRUCTION
COMPANY, INC., a New Mexico Corporation,

      Defendants,

and LUTHER CONSTRUCTION COMPANY INC.,
a New Mexico Corporation,

      Counter-claimants,

vs.

TASCO ELECTRIC, a Utah Corporation,

      Counter-defendant.

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Defendants Fidelity and Deposit Company of Maryland ("Fidelity") and Luther Construction

Company, Inc. ("Luther") respectfully request that the Court enter the following findings of fact and

conclusions of law, which are being submitted pursuant to the Clerk of the Court's June 27, 2000 letter

to counsel:



## FINDINGS OF FACT

### *Parties*

1.     Luther is a New Mexico corporation, a general contractor licensed in both Arizona and New Mexico, who on January 31, 1994 contracted with the Bureau of Indian Affairs ("BIA") to construct the Western Navajo Juvenile Service Center, a detention facility, in Tuba City, Arizona (the "Project").

2.     Fidelity is a surety company authorized to do business in New Mexico and Arizona, who provided payment and performance bonds for the Project.

3.     Tasco Electric, Inc. ("Tasco"), is a Utah corporation, who entered into a subcontract agreement on June 21, 1994, for electrical and special systems work on the project.

4.     Ellen Chamberlin is the Vice-President of Luther, and was the Luther person in overall charge of the Project.

5.     Richard Bert was Luther's project superintendent on the Project. As such, Mr. Bert was responsible, inter alia, for supervising Luther's workers and managing the day-to-day construction of the Project.

6.     Gary Tassainer was at all pertinent times a principal and owner of Tasco and somewhat involved in managing Tasco's work on the Project.

7.     Arvel Tassainer was Tasco's project manager for the Project and was in overall charge of Tasco's work on the Project.

8.     Tony Lewis was the President of Tasco, and upon information and belief, performed some work on the Project.

9.     For most of the duration of Tasco's work on the project, Roy Sneddon was Tasco's foreman on the Project, in charge of Tasco's day-to-day operations at the job site.

10.     Cami Lewis was an office worker at Tasco's office in Phoenix, Arizona who processed pay applications, signed certified payrolls, and performed other tasks for Tasco's work on the Project.

### *The Contracts*

### *Luther and the BIA*

11.     Luther contracted with the BIA to construct the Project. Luther was allotted 540 days from the date of the notice to proceed to complete the Project. The notice to proceed was issued effective March 21, 1994, and Luther was allowed until September 11, 1995, to complete the Project. Luther was allowed additional time per change order, to at least October 14, 1995, to complete the Project.

12.     Pursuant to the contract, Luther was to construct the Project per the plans and specifications for the Project. Luther had authority to hire subcontractors to work on the Project.

### *Luther and Tasco*

13.     Tasco's fixed-price subcontract with Luther ("Subcontract") was for $766,783. Tasco was required to complete the entire work, covered by the Subcontract within 450 calendar days after verbal notice to proceed, which was given on approximately July 9, 1995, for an October 2, 1995 substantial completion date.

14.     The Subcontract included "additional provisions of subcontract." The additional provisions incorporated the general contract, plans, drawings, and specifications and addenda into the Subcontract.

-3-

15.     The Subcontract required that Tasco keep itself thoroughly informed as to the progress of the job. The additional provisions, at paragraph 6, obligated Tasco to use the monies received for the performance of the Subcontract primarily for labor and materials entering into the work on the Project, and that said monies shall not be diverted to satisfy obligations of the subcontractor on other contracts.

16.     The additional provisions at paragraphs 18 and 19, allowed Luther to complete Tasco's work, at Tasco's expense, if Tasco refused to do so.

17.     In the Subcontract and any of its related provisions, Luther did not assume liability to Tasco for the conduct of the BIA or any other governmental entities.

18.     Tasco knew at the time it entered into the Subcontract that it was beginning the Project after other trades had begun, and later than the electrical contractor usually would have begun the Project. Tasco had an opportunity to price its late start on the Project or to refuse to do the Project. Tasco was not forced to enter into the contract under Luther's terms.

19.     Tasco started the Project on approximately July 11, 1994.

20.     In June 1994 Luther sent Tasco a preliminary schedule that showed Tasco's work on the Project ending on approximately August 30, 1995.

21.     The schedule given to Tasco in June 1994 quickly became outdated, overtaken by events, and Tasco was thereby obligated to keep itself informed as to the Progress of the Project.

22.     By Tasco's own admission in its pay application, by September 30, 1995, on pay application # 15, Tasco considered itself to be 98% complete with the Project. On its pay application for the month of August 1995 Tasco considered itself to be 91% complete with the Project. On its October 1995 pay application Tasco represented that it work was 99% complete.

-4-

23.     From September 1995 through the completion of the Project, Tasco was primarily working on change order work, punch list work, Skyline's work, and correcting defective work.

### *Payment Bond*

24.     Fidelity executed a payment bond on February 4, 1994 for the Project (Contract No. K600941427) in the penal sum of $2,448,500.00

25.     The bond was limited to its terms as interpreted by federal law.

26.     Fidelity's liability limited to the penal sum of $2,448,500.00.  Tasco cannot recover attorney's fees or any other types of damages from Fidelity.

27.     Tasco sued Fidelity on the payment bond on May 13, 1997.

### *Tasco's Bid*

28.     Tasco bid the Project in late 1993.

29.     Tasco's bid was broken down into categories of material, labor, miscellaneous materials, special systems, profit and miscellaneous. Tasco's bid for labor included, on each labor hour, profit, overhead, and labor burden.

30.     Tasco's labor was broken down into three categories — journeyman, apprentice and laborer.

31.     Tasco did not bid a non-working foreman.

32.     Tasco's bid for the electrical and special systems work on the Project was not reasonable.  In its bid, Tasco did not adequately allow for the remote location of the Project; the lack of a loyal, experienced crew for the project; a non-working superintendent, and for other contingencies. Tasco also underbid the number of man hours it would take to complete the Project, and did not adequately price labor for the Project, including the effect of labor availability.

### *Tasco's Payment, Delay and Lost Productivity Claims:*
### *Luther Properly Managed the Project and did not Breach the Contract*

33.    Dick Bert was an experienced construction superintendent who coordinated the activities of Luther and its subcontractors on the Project. Mr. Bert held regular subcontractor meetings, talked to the subcontractors virtually every day, was always available for questions, promptly transmitted requests for information to the BIA, properly scheduled and coordinated the work of the subcontractors, and did not hinder or delay Tasco in any way. Mr. Bert provided updated project scheduling information on a timely basis.

34.    Luther did not delay Tasco's prosecution of its working project. Luther made timely decisions. The timing of the masonry work, door frame delivery and smoke damper decision did not delay Tasco's work. Tasco was responsible for any delay attributable to the timing of the door lock system approval.

35.    Luther did not adversely impact Tasco's productivity on the Project. The timing and execution of masonry work for the Project did not adversely affect Tasco's performance. Nor did the timing of the door frame delivery or the smoke damper decision. Luther promptly forwarded requests for information to the BIA and timely forwarded the BIA's responses. Luther properly coordinated the work of other trades, provided updated schedules to Tasco on a timely basis, and also made and communicated decisions on components of the Project that affected Tasco on a timely basis.

36.    Luther paid Tasco promptly for its work, including all work Tasco performed pursuant to change order and any materials encompassed in the change order work.

37.    Tasco's subcontract called for Tasco to complete its work by about October 2, 1995. By September 30, 1995, Tasco considered itself to be 98% complete with its work and by October 1995 to be 99% complete with its work.

-6-

38.     Tasco's delay and loss of efficiency, if any, were attributable to its own

mismanagement. Neither Luther nor those for whom Luther is legally responsible caused Tasco to

spend any additional man hours or moneys on the Project.

39.     Tasco's subcontractors did not experience overruns on their material or labor.

40.     No other subcontractor who worked on the project filed a delay or productivity against

Fidelity or Luther.

41.     The slow answers to some requests for information did not result in injury to Tasco.

### *Tasco's Performance on the Project*

42.     Tasco did not adequately supervise the Project. Tasco's foreman, Roy Sneddon, had

never worked for Tasco before this Project. Mr. Sneddon was hired from an ad out of the newspaper,

and was not Tasco's first choice for superintendent. Roy Sneddon was, for the most part, a non-

working foreman. He was inefficient and should have worked more productively and actively. Tasco

let him go before the end of the Project.

43.     Tasco priced and signed change orders for all change order work that it performed on

the Project. Tasco was obligated to include in its change orders all pricing, impacts, delays,

and changes for change order work.

44.     While Tasco was on the Project longer than it had anticipated, it did not install any

additional materials, and its work simply took place over a longer period of time. The duration of

Tasco's work shifted, but it did not perform any additional work, except change order work for which

it was paid proper compensation for its labor, materials, and delays and productivity impact, if any, by

Luther.

45.     The BIA project required that Tasco and all other contractors submit certified payrolls

identifying the hours it worked on the Project, and is the official record of hours expended by Tasco on the Project.

46.     Tasco's certified payrolls numbered 1 through 97 show that Tasco's workers spent 10,180 hours total on the Project, and that Tony Lewis, the company president, had 443 hours on the certified payrolls, but was a supervisor and president of the company, and his hours should not count toward the total hours worked by Tasco because he was paid a salary.

47.     Roy Sneddon worked approximately 1,245 hours on the Project. Mr Sneddon hardly even worked with his tools, certainly not more than 5% to 10% of the time he worked on the Project.

48.     The masonry contractor was not authorized or obligated to install any of Tasco's electrical boxes or conduit in the masonry walls of the Project. Tasco's claim that it spent some time installing electrical boxes and conduit that the mason is without merit, and a number of hours shall be deducted from Tasco's claim for time it claims to have spent installing electrical boxes that Tasco claims the masons should have installed.

49.     Tasco failed to maintain or retain adequate records of its work on the Project, including documentation relating to alleged non-payments, alleged delays and alleged lost productivity.

50.     Tasco abandoned the Project in about February, 1995. Tasco last certified work on the Project on May 18, 1996.

51.     Taking into account Tasco's inefficiencies and reductions in hours from changes, Roy Sneddon hours, Tony Lewis hours, Tasco did not spend any more man hours on the Project than it was compensated for by Luther.

52.     Tasco has not proved by competent productivity or schedule analysis that Luther is liable for or caused injury to Tasco.

### *Tasco's Damages and Total Cost Claim*

53.     Tasco could have avoided damages by reducing its on-site crew; using its crew more efficiently, including Mr. Sneddon; better supervising the performance of its crew and revising its bid before or during the initial stages of its work on the Project.

54.     Tacso waived its right to seek compensation beyond the fixed-price and change order amounts through its execution of change orders and lien releases.

55.     The record reflects that Luther paid Tasco all of the money Tasco was entitled to receive for its work on the Project, including all change order work performed by Tasco.

56.     Tasco rests its damages claims, for all of its claims against Luther, upon a total cost claim.

57.     Tasco did not demonstrate that it had no other means for proving its alleged damages.   There are other methods available to analyze and calculate Tasco's alleged delay and productivity impact damages.

58.     Tasco's bid was not reasonable or realistic and was too low for the work it was required to perform on the Project.

59.     Tasco's actual costs were not reasonable.

60.     Tasco was responsible for the costs that it incurred which exceeded its original bid and/or agreed-upon amounts for change order work.

61.     Tasco's records relating to its work on the Project are incomplete.   Tasco has not introduced adequate back-up documentation to support its total cost claim or its damages.  Tasco could have determined the precise amount of its claim had it kept appropriate records of all costs and done a better analysis.

62.     The total cost claim analysis and supporting evidence submitted by Tasco is insufficient to prove Tasco's damages. Tasco copied its labor hours price from the original bid for its claim. The original bid included labor, profit, overhead (general and home office) and burden. Tasco did not break down its labor into the three labor groups.

63.     Mr. Sneddon should have been a working superintendent and Tasco's claim for his 1245 hours is denied.

64.     Tony Lewis was the company president. His hours should not be charged as delay hours because Tasco seeks to recover for his time as part of home office overhead.

65.     Tasco is not entitled to additional home office overhead. Tasco has not presented any evidence that it was on standby or that it could not perform other work or that it could not have laid off employees.

66.     Nor can it recover for profit and home office overhead in both the labor rate and as separate items of recovery.

### *Luther's Damages*

#### *Damages Resulting from Tasco's Failure to Pay Skyline and Others*

67.     Tasco was obligated to pay its subcontractors and suppliers on the Project.

68.     Tasco failed to pay at least one subcontractor, Skyline Fire & Communications, Inc. ("Skyline") amounts due Skyline.

69.     In early 1996 Skyline refused to work because Tasco failed to pay Skyline monies which Luther had paid Tasco in November 1995 for Skyline's work.

70.     Luther paid Skyline $40,000 in February 1996 to secure Skyline's continued work on the Project.

-10-

71.     Tasco failed to pay Skyline at the end of the Project, and Skyline sued Luther, Fidelity and Tasco in federal district court in Phoenix, Arizona.  In settlement of the Skyline lawsuit, Luther paid Skyline $42,000 and Luther and Fidelity incurred attorney's fees of approximately $19,997 in litigating and settling the Skyline case.  Tasco and Luther entered into a settlement agreement whereby Tasco agreed to reimburse Luther for amounts spent in settling the Skyline lawsuit.

72.     Luther has paid Tasco or others on Tasco's behalf all Tasco is owed and more for Tasco's work on the Project.

73.     Luther is entitled to judgment against Tasco for $42,000 for the direct payment to Skyline, plus $19,977 for the costs Luther spent litigating Skyline's claim and prejudgment interest.

74.     Tasco delayed Luther's work on the Project, for which Luther is entitled to $21,900.

75.     Luther is entitled to total damages on its counterclaims of $120,723.16, plus judgment and interest.

76.     Luther is entitled to reasonable attorney's fees.

### *Damages Resulting from Luther's Completion of Tasco's Work and Tasco's Non-Delivery of As-Builts*

77.     Tasco failed to complete its work on the Project, including the fire alarm, intercom systems and some electrical systems, which prevented the Project from being turned over to the BIA in a timely manner.

78.     Pursuant to the terms of their contract, Luther completed Tasco's work, and facilitated the completion of Tasco's and Skyline's work at Luther's expense.  Luther incurred expenses for labor, materials, travel and supervision in the amount of $ 7,086.08.

79.     Tasco was obligated to provide as-built drawings to Luther, for transmittal to the BIA.

-11-

Tasco failed to provide Luther with as-builts, which resulted in the BIA withholding $19,134 from Luther's final payment pending receipt of the as-builts from Tasco.

80.     Luther has demanded the as-builts from Tasco, but they have not been provided.

81.     Luther is entitled to $19,134 plus interest, from Tasco, either by way of a judgment or offset against any recovery by Tasco, for failure to provide the as-builts.

## CONCLUSIONS OF LAW

### *Choice of Law*

82.     Tasco's Miller Act claim is governed by federal law. See F.D. Rich Co. v. United States ex. rel. Indus. Lumber Co., 417 U.S. 116 (1974).

83.     The last act to complete the Subcontract between Luther and Tasco was the signature of Luther, which was performed in New Mexico. Pursuant to New Mexico's choice of law, the breach of contract claims in this cause of action are governed by New Mexico law. Tucker v. R.A. Hanson Co., 956 F.2d 215, 217 (10th Cir. 1992) (New Mexico Courts normally look to the place of contracting for the applicable law).

84.     The tort claims of negligence in this case are governed by Arizona law. See, e.g., Roberts v. Piper Aircraft Corp, 100 N.M. 363, 366, 670 P.2d 974, 977 (Ct. App. 1983) (negligence claim is governed by law of state where last alleged wrong took place).

### *Burdens of Proof*

85.     On each of its claims, Tasco must prove liability and the amount of its alleged damages by a preponderance of the evidence. Martin v. Duffie, 327 F. Supp. 960, 963 (D.N.M. 1971) (in civil actions for money damages, burden to prove each essential element of claim, including damages, falls on plaintiff), rev'd on other grounds, 463 F.2d 464 (10th Cir. 1972).

86.     On its counterclaims against Tasco, Luther also must prove liability and its damages by a preponderance of the evidence. See id.

87.     Under New Mexico law, contract damages can be challenged as speculative as to their cause, their existence or their amount. Otero v. Buslee, 695 F.2d 1244, 1250 (10th Cir. 1982.) Damages on any type of claim cannot be based on surmise, conjecture or speculation; they must be proven with reasonable certainty. Mascarenas v. Jaramillo, 111 N.M. 410, 415, 806 P.2d 59, 64 (1991).

### *Tasco's Claims*

### *Miller Act Claim Against Fidelity*

88.     To prevail on its claim under the Miller Act, 40 U.S.C. §§ 270a-270f, Tasco must show that: (1) it supplied materials and labor for work in the contract at issue; (2) it was not paid for materials or labor; (3) it "had a good faith belief that the materials and labor were for the specified work"; and (4) "jurisdictional requisites [were] met." See United States ex rel. Krupp Steel Prods., Inc. v. Aetna Ins. Co., 831 F.2d 978, 980 (11th Cir. 1987).

89.     Tasco cannot recover damages for expenses or costs caused by its own conduct, including any and all cost overruns that resulted from its own negligence or mismanagement of its work on the Project. See, e.g., United States ex rel. T.M.S. Mechanical Contractors, Inc. v. Millers Mut. Fire Ins. Co., 942 F.2d 946, 952 (5th Cir. 1991) (subcontractor cannot recover from Miller Act surety additional or increased costs caused by the subcontractor's delay); see also United States ex rel. Rent It Co. v. Atena Cas. & Surety Co., 988 F.2d 88, 90-91 (10th Cir. 1993) (subcontractor not allowed to recover machinery cost repairs which resulted from its negligent use of the machinery).

90.     Nor can it recover any damages under its claim if the record reflects that it was properly

-13-

paid for the materials and labor that it supplied for the Project. See Rocky Mountain Tool & Mach. Co. v. Tecon Corp., 371 F.2d 589 (10th Cir. 1966) (subcontractor was not permitted to recover damages because it had been paid in full for the period of time in question).

91.     Tasco cannot recover for delay damages from Fidelity. See L.P. Friestedt Co. v. United States Fireproofing Co., 125 F.2d 1010 (10th Cir. 1942).

92.     The record in this case shows that Tasco's claim against Fidelity fails on that and other grounds cited by the Court. The evidence before the Court shows that the cost overruns incurred by Tasco resulted from its own negligence and mismanagement of its work on the Project. The evidence further reflects that Tacso was properly paid by Luther in accordance with the parties' contract, including for any work Tasco performed pursuant to change order.

93.     Tasco's claim against Fidelity accordingly fails as a matter of law.

### Breach of Contact Claim Against Luther

### Payment Claim

94.     To prevail on this claim, Tasco must prove that Luther failed to pay it in accordance with the terms of their contract. See Naranjo v. Ortiz, 94 N.M. 393, 394, 611 P.2d 216, 217 (1980) (no damages may be awarded unless breach of contract is proven); see also Rule 13-823, NMRA 2000 comm. cmt. (citing Farnsworth on Contracts for black-letter principle that the performance of a party's obligation under contract bars finding of breach).

95.     The evidence in the record shows that Luther paid Tasco in accordance with the terms of their contract, including all of the work Tasco performed pursuant to change orders. Luther, in fact, retained from Tasco amounts that were insufficient to compensate Luther for expenses Luther incurred in finishing Tasco's work, paying Skyline and others, and other legitimate expenses.

-14-

96.     The record also establishes that Tasco waived its right to seek additional compensation from Luther, above and beyond the fixed-contract price and agreed upon amounts for change order work, by executing change orders and lien releases.  See, e.g., Eslin Co., ASBCA No. 34029, 87-2 B.C.A. (CCH) ¶ 19,854; see also Pittman Constr. Co., GSBCA Nos.  4897-R, 4923-R, 81-1 B.C.A. (CCH) ¶ 15,111.

97.     Based upon the foregoing conclusions, the Court finds that Luther did not breach its duty to pay Tasco and that Tasco's payment claim accordingly fails as a matter of law.

### *Delay Claim*

98.     To prevail on its construction delay claim, Tasco must prove that each alleged delay was: (1) excusable; (2) compensable; (3) the fault of Luther or a party for whom Luther is responsible and (4) critical.  CCM Corp. v. United States, 20 Cl. Ct.  649 (1990); see also Wunderlich Contracting Co. v. United States, 351 F.2d 956, 969 (Ct. Cl. 1965).

99.     An excusable delay is one which is beyond the contractor's control and was not foreseeable.  See B. Bramble and M. Callhan, Construction Delay Claims § 1.2, at 2-3 (2nd ed. 1992) An excusable delay will entitle the contractor to an extension of time to complete the performance of the contract, but does not by itself entitle the contractor to compensation.

100.    To be compensable, a delay must result solely from the delay of the other party.  See, e.g., Utley-James, Inc., GSBCA NO. 5370, 85-1 B.C.A. (CCH) ¶ 17, 816, aff'd, 14 Cl.  Ct.  804 (1988).

101.    Concurrent delays occur when there are two or more independent delays during the same time period, although the periods of concurrency do not have to precisely match.  See, e.g., McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906 (E.D. Va. 1989), aff'd in part, rev'd in part on other grounds, Nos. 89-2099, 89-2111, 1990 WL 118747 (4th Cir. Aug. 17, 1990).  Where concurrent

delays consist of delays attributable to both the defendant and the claimant, neither can recover damages from each other unless the delay can be allocated to the concurrent causes of delay. See J.A. Jones Constr. Co. v. Greenbrier Shopping Ctr., 332 F. Supp. 1336 (N.D. Ga. 1971), aff'd, 461 F.2d 1269 (5th Cir. 1972); see also Commerce Int'l Co. v. United States, 338 F.2d 81 (Cl. Ct. 1964) (party must allocate expenses to the separate concurrent delays). If the parties are unable to allocate the concurrent delay, the court may not attempt to apportion the responsibility for the concurrent delay. See Sun Ship Bldg. & Drydock Co., ASBCA No. 11300, 68-1 B.C.A. (CCH) ¶ 7, 054 (1968). Even if a delay can be apportioned, a party cannot recover its delay costs unless it can also clearly allocate the expenses attributable to the separate concurrent delays. See Commerce Int'l, 338 F.F.2d at 89-92.

102.    Critical delays are delays that impact overall completion of a project. See Roberts Constr. Co., ASBCA No. 34062, 87-3 B.C.A. (CCH) ¶ 20, 117 (1987). It is the claimant's burden to establish a causal link between an event and overall project delay. Law v. United States, 195 Cl. Ct. 370 (year). It is also the claimant's burden to prove the duration of the actual delay and the cost impact of the delay. Pathman Constr. Co. v. United States, 652 F.2d 70 (Ct. Cl. 1980).

103.    Mere allegations of delay damages do not prove the existence of such damages. J.R. Roberts Corp., DOT CAB No. 2499, 98-1 B.C.A. (CCH) ¶ 29,680, at 147,009; see also International Equipment Servs., Inc., ASBCA Nos. 21104, 23170, 82-3 B.C.A. (CCH) ¶ 16,675. When a subcontractor asserts a claim of compensable delay, it must prove the extent of the delay, that the delay was proximately caused by the contractor's action and that the delay harmed the subcontractor. See id.; see also William F. Klingersmith, Inc. v. United States, 731 F.2d 805, 509 (Fed. Cir. 1984).

104.    Claimants usually prove liability from delays and causation of harm through expert

testimony and a schedule analysis. See, e.g., Haney v. United States, 230 Ct. Cl. 148, 168 (1982) (parties proffered well-recognized critical path damages analyses). Under this approach, a plaintiff must prove which items on a project were on the critical path and the time period that the items remained on the critical path. G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 727 (1984); see also Ballenger Corp., DOT CAB No. 74-32, 84-1 B.C.A. (CCH) ¶ 16,973 (explaining that critical path analysis must include documentation of actual job performance).

105.    Tasco and its experts have undertaken no acceptable, competent analysis to prove liability or causation linking Luther to any of Tasco's alleged delay damages.

106.    Tasco has otherwise failed to offer any evidence, including a competent schedule analysis, which proves that the alleged delays were excusable, compensable, caused by Luther or anyone for whom Luther is responsible or on the critical path for the Project.   Tasco also failed to provide any evidence which establishes the cost impact of each of the alleged delays.

107.    Tasco has not provided competent analysis and supporting evidence to substantiate the allegations of its delay claim, and the claim accordingly fails as a matter of law.

### Productivity Impact Claim

108.    To prevail on its loss of productivity claim against Luther, Tasco must prove liability on the part of Luther, causation of injury by Luther's liability, and resultant injury.  G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 737 (1984).

109.    To establish liability, Tasco must show that Luther owed and breached an express or implied duty to Tasco.  See, e.g., S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F. Supp. 1014 (S.D.N.Y. 1984), aff'd mem., 762 F.2d 990 (2nd Cir. 1985).

110.    To prove causation, Tasco must show that Luther's breach of duty resulted in harm to

Tasco.  See Wunderlich Contracting Co. v. United States, 351 F.2d 956, 964 (Cl. Ct. 1965); see also Triax Co. v. United States, 28 Fed. Cl. 733 (1993) (plaintiff's failure to prove causation barred recovery).

111.    To prove injury, Tasco must demonstrate through competent analysis that it in fact sustained losses as a result of Luther's breach of duty and that the losses were attributable to Luther or someone for whom Luther is responsible.  Assurance Co. v. United States, 813 F.2d 1202 (Fed. Cir. 1987).

112.    Productivity losses must be proven by competent analysis, including productivity and schedule analysis.

113.    Tasco has not provided competent analysis and supporting evidence to prove liability, causation or injury on its loss of productivity claim, and its productivity claim accordingly fails as a matter of law.

### *Quantum Meruit*

114.    The essential elements of recovery under a claim for quantum meruit are (1) valuable services were rendered or materials furnished, (2) for the person sought to be charged, (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him and (4) under such circumstances as reasonably notified person sought to be charged that plaintiff, in performing such services, was expected to be paid by the person sought to be charged.  Black's Law Dictionary at 1243 (6th ed. 1990).

115.    Tasco failed to provide sufficient evidence to supported its claim for quantum meruit

damages. The record instead reflects that Luther properly and promptly paid Tasco for all work Tasco performed pursuant to change orders. Tasco's quantum meruit claim accordingly fails as a matter of law.

### *Tasco's Damages*

116.    Based on the Court's analysis of Tasco's Miller Act claim against Fidelity, Tasco is not entitled to recovery any damages from Fidelity, including any attorney's fees or costs that it incurred in pursuing the claim.

117.    Tasco was required to maintain and submit on a weekly basis certified payrolls showing the name, address, social security number, classification, hourly rate or wages paid and daily and weekly hours for all of its workers on the Project. The certified payrolls certify that the information set forth therein is correct. Falsification subjects the contractor to federal prosecution. See 48 C.F.R. § 52.222-8 (1988).

118.    Tasco was required to keep its payrolls and basic records for its work on the Project for three years after the completion date after the Project. See 48 C.F.R. § 52.222-8 (1988).

119.    Tasco did not maintain or retain such records for three years after completion of the Project.

### *Tasco's Cost Claim/Tasco Damages*

120.    Tasco submitted and relied upon a "total cost claim" to recover its alleged damages. Under the total cost approach, a plaintiff seeks the difference between its actual costs of performance and its anticipated costs of performance, claiming that the full cost overrun is due to the contractor or those for whom the contractor is responsible. Phillips Constr. Co. v. United States, 394 F.2d 834 (Ct. Cl. 1968).

-19-

121.    "A trial court must use the total cost method with caution and as a last resort."
Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991). The total cost method
is suspect because it assumes the original contract price was  proper and profitable and that any
additional cost must have arisen because of the delay or interference that was the responsibility of
Luther. Phillips Constr. Co., 394 F.2d at 841.

122.    The acceptability of the total cost method hinges on the plaintiff proving that : (1) the
nature of its particular losses make it impossible or highly impracticable to determine them with a
reasonable degree of accuracy; (2) the plaintiff's bid or estimate was reasonable; (3) the plaintiff's
*actual costs were reasonable; and (4) the plaintiff was not responsible for any of added costs.*  WRB
Corp. v. United States, 183 Ct. Cl. 409, 426 (1968); see also G.M. Shupe, Inc. v. United States, 5 Cl.
Ct. 662, 675 (1984).  Courts are reluctant to approve total cost claims, particularly where records
are incomplete.  See Boyajain v. United States, 423 F.2d 1231, 1242-44 (Ct. Cl. 1970).

123.    Even when total cost methodology may be properly used, it is the last step, not the first
or only step, in a breach of contract analysis.  Total cost becomes relevant only after the claimant has
proven all other elements of its breach of contract claim and established liability.  Total cost is not a
method of proving liability or causation.  See Wunderlich Contracting Co. v. United States, 351 F.2d
956, 965 (Ct. Cl. 1965).

124.    Expert testimony, standing alone, is insufficient to satisfy Tasco's burden of proof on
the elements of a total cost claim.  Luria Brothers & Co. v. United States, 369 F.2d 701, 713-14 (Ct.
Cl. 1967).  Its expert's testimony had to be corroborated with competent evidence that substantiated
his analysis for each of its damage claims.  See, e.g., J.R. Roberts Corp., DOT CAB No. 2499 98-1
B.C.A. (CCH) ¶ 29,680 (expert testimony rejected for lack of corroboration by project-specific facts

and documentation); <u>John E. Green Plumbing & Heating Co. v. Turner Constr. Co.</u>, 742 F.2d 965, 967 (6th Cir. 1984) (damages witness failed to provide evidence to support his analysis of the plaintiff's alleged damages); <u>see also</u> <u>R.W. Contracting Inc.</u>, ABSCA No. 24627, 84-2 B.C.A. (CCH) ¶ 17,302 (other than amount conceded by defendant, court barred recovery by plaintiff for lost productivity impacts because of lack of documentary evidence supporting plaintiff's claims.).

125.    To prove that it was entitled to home office overhead due to delays, Tasco had to make a prima facie case which demonstrated that Luther caused delay or suspension of work which affected Tasco's operations so that it was not practical for Tasco to undertake other work and forcing Tasco into a standby status. <u>See</u> <u>Interstate Gen.  Government Contractors v. West</u>, 12 F.3d 1053, 1057 (Fed Cir. 1993).

126.    All of Tacso's damages claims must be substantiated with competent evidence, including but not limited to, timesheets, invoices, checks, and bills.  Without such proof the existence and amount of Tasco's damages, are entirely speculative.

127.    Tasco failed to offer sufficient evidence to satisfy the requirements for asserting and prevailing on its total cost claim.  Tasco accordingly cannot recover any of its alleged loss of productivity or delay damages from Luther, including any attorney's fees or costs incurred in pursuing the claims.

128.    Tasco also failed to offer any evidence which demonstrated that it was on standby or that it could not take on other work. Tasco accordingly cannot recover any extended overhead damages or relief from Luther on this claim.

129.    Based on the court's analysis of Tasco's quantum meruit claim against Tasco cannot recover any damages from Luther on the claim, including any attorney's fees or costs that it incurred

in pursuing the claim.

*Luther's Counterclaims and Damages*

130.    "Failure to deny an averment in a pleading to which a responsive pleading is required, other than those as to the amount of damages, is deemed an admission" of the averment.  2 J. Moore, Moore's Federal Practice § 8.08[1], at 8-44 to 8-44.1 (3rd ed. 2000).  Rule 7 requires a party to file a reply to a counterclaim designated as such to avoid such admissions.  See Fed. R. Civ. P. 7(a); see also Fed. R. Civ. P. 8(d) (failure to deny averments, other than as to damage amounts, results in their admission).

131.    In its answer to Tasco's amended complaint, Luther asserted counterclaims, designated as such, for breach of contract, negligence, and recoupment.

132.    Because Tasco failed to file a reply denying any of the averments set forth Luther's breach of contract, negligence and recoupment counterclaims, the averments are taken as true for purposes of establishing Tasco's liability on each of the counterclaims, with the exception of the amount of damages recoverable by Luther on each of the claims.

133.    Even if Tasco had filed an appropriate reply to Luther's counterclaims, Luther is entitled to recover damages for breach of contract and negligence in the amounts that Luther proved it was damaged by Tasco's failure to pay Skyline, failure to complete the Project and failure to provide as-builts.

134.    Tasco was required to promptly pay Skyline for Skyline's work on the Project.  48 C.F.R. § 52.232-27 (1988).

135.    Tasco failed to pay Skyline $42,000, and incurred $19,997 in costs and attorney's fees in the skyline matter for which Tasco is responsible pursuant to its settlement agreement with Luther.

-22-

136.   Luther has also claimed damages for delay, Tasco's failure to pay Skyline, for completing Tasco's work, all of which Luther is entitled to be compensated for by Tasco.

137.   The Court concludes that Luther is entitled to recover $ 120, 713.16, plus judgment and interest on its counterclaims and/or to offset that amount against any amounts recovered by Tasco.

138.   The Court also concludes that Luther is entitled to recover the costs of this action, including reasonable attorney's fees pursuant to the attorney's fee provision in the parties' subcontract and the parties' settlement agreement for the Skyline litigation.

Respectfully Submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.,

By _____
     David W. Bunting
Attorneys for Defendants Fidelity and Deposit Company of
Maryland & Luther Construction Company, Inc.
Post Office Box 1888
Albuquerque, New Mexico 87103
Telephone:  (505) 765-5900

We hereby certify that a copy of the
foregoing  pleading was mailed to:

Robert F. Babcock, Esq.
Walstad & Babcock
57 West South Temple, 8th Floor
Salt Lake City, Utah 84101

Sean R. Calvert, Esq.
1303 Rio Grande Blvd., NW, Suite 7
P.O. Drawer 6305
Albuquerque, New  Mexico 87197-6305

this 24th day of July, 2000:

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.,

By _____
        David W. Bunting, Esq.